(52 South. 1028.)

No. 17,875.

YERGER v. MURDOCH.

(June 6, 1910. On Application for Rehearing, June 25, 1910.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 584*) — WEIGHT AND SUFFICIENCY.

A claim for over $500 must be established by the testimony of two witnesses, or of one witness and corroborating circumstances.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2427; Dec. Dig. § 584.*]

2. ASSIGNMENTS (§ 137*) — CONTRACTS — EVIDENCE TO ESTABLISH.

The testimony of the lessee of a cotton plantation, in the northern part of the state, to the effect that, about October 1st, in New York, the owner agreed to buy the tenants' accounts, at their face value, up to $5,000, in order to regain possession, without litigation or delay, is insufficient to make out a case, when contradicted by the other contracting party, and when the evidence shows that it was not known what amounts the tenants then owed, or would owe at the end of the year, and when it does not show that the accounts were ever assigned to the alleged purchaser, that the debtors were ever notified that they could discharge their debts by payment to any other than the original debtor, that the alleged purchaser collected or attempted to collect said accounts, or that the alleged seller did not, after the alleged sale, collect such of them as he could.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 234; Dec. Dig. § 137.*]

3. SALES (§ 52*)—EVIDENCE TO ESTABLISH.

And so the unsupported testimony of a lessee, to the effect that the lessor agreed, with no information save the lessee's statement, to pay him over $1,050 for peas alleged to have been purchased and planted, as a fertilizer, is insufficient for recovery, where it appears that peas had always been planted on the same land, for the same purpose, and that the property when surrendered by the lessee was in no better condition than when received by him, or than as required by his lease.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 136; Dec. Dig. § 52.*]

Appeal from Ninth Judicial District Court, Parish of Madison; F. X. Ransdell, Judge.

Action by George S. Yerger against A. A. Murdoch. Judgment for plaintiff, and defendant appeals. Amended and affirmed.

E. C. Montgomery and Hudson, Potts & Bernstein, for appellant. Snyder & Gilfoil (M. M. Boatner, of counsel), for appellee.

## Statement of the Case.

MONROE, J. Plaintiff alleges that up to January 1, 1906, he was the lessee of defendant's "Fortune Fork" and "Banner" plantations; that at or about the termination of this lease, he sold to defendant, represented by her agent, W. S. Holmes, certain live stock, farming implements, peas, oats, and cotton seed, and handed her cash, the whole amounting to $2,127.45; that he also sold, as-

signed, and delivered to her certain accounts, due him by tenants on said plantations, amounting to $4,668.01; that defendant has paid him $100, leaving due a balance of $6,-695.46, for which he prays that he have judgment, with interest. Plaintiff annexes to his petition, and makes part thereof, an account, which reads:

Account of George S. Yerger.

Mrs. A. A. Murdoch.

Fortune Fork and Banner Plantation to George S. Yerger, Dr.

| 1905. | | | |
|---|---|---|---|
| Aug. | Cash, handed you in New York | | $ 150 00 |
| Jan. 1. | 10 Double shovels at $ 3 00 | | 36 00 |
| | 14 plows " 8 00 | | 112 00 |
| | 6 cotton planters " 11 00 | | 66 00 |
| | 16 cultivators " 7 00 | | 112 00 |
| | 14 hogs | | 56 00 |
| | 17 pigs | | 8 50 |
| | 12 cows | | 180 00 |
| | 300 bu. peas & planting | | 1,050 00 |
| | 60 sacks oats, 330 bu., 54 cts. | | 178 20 |
| | 4½ tons tools & Peterkin Co. seed | | 148 75 |
| July | Cash handed you on train | | 30 00 |
| | | | $2,127 45 |
| | Tenants' accounts | | 4,668 01 |
| | | | $6,795 46 |
| | By cash | | 100 00 |
| | | | $6,695 46 |

Defendant pleads the general issue, and specially denies that her agent bought the tenants' accounts, as alleged, or that he was authorized so to do.

It appears that defendant was under interdiction, and that on November 22, 1904, her guardian, the Mississippi Bank & Trust Company of Mississippi (where she then lived), by written instrument, leased her plantation, in Madison parish, La., with certain reservations, to plaintiff, for one year, from January 1, 1905, at an annual rental of $6,700, for which plaintiff gave his note, payable on November 1, 1905. The lease contained, among others, the following stipulation, to wit:

"And the party of the first part * * * hereby further covenants and agrees that it will, on or before November 1, 1905, if the party of the second part so desires and requests, grant and execute to him a new lease of the premises, here demised for the said further term of five years, to commence from the expiration of the term hereby granted, the same to be at the same annual rental. * * * The party of the second part * * * agrees, at the end of this lease, to return possession of the premises and appurtenances herein leased in like good order as received, the usual decay, wear and tear and accidents of Providence, only, excepted."

Some time after the execution of the lease, defendant was relieved of the interdiction and reinvested with the control of her property, and in July, 1906, she appointed W. S. Holmes her agent and attorney in fact, with full power of administration. It appears, too, that, Fortune Fork plantation having been her home, she wished to return to it, and gave some intimation to that effect, which reached the negroes, and, through them, the plaintiff. In the fall of 1905, therefore (say about the last of September or first of October), plaintiff went to New York, where defendant and Holmes were then sojourning, for the purpose of making some arrangement with regard to his interest; the position that he first assumed being that he had the right to avail himself of the option to extend his lease. He testifies, in effect, that, when he broached the subject, Holmes denied that he had any such right, and said that the option was not worth the paper upon which it was written, and plaintiff seems to have accepted that view of the matter and to have then offered $1,500 as additional rent for the renewal of his lease, which offer was declined. He then took the position that he could retain possession of the property for some time and give defendant trouble, in one way or another, and would do so, unless she agreed to comply with certain demands with regard to advances which he had made to the tenants and to the reimbursement of money expended by him in the purchase and planting of a lot of peas. He testifies that the matter was discussed with both defendant

and Holmes, and his first statement as to the result of the discussion is as follows:

"She (defendant) insisted that she was going to run the property another year, and I, very plainly, told her and Mr. Holmes that, unless they paid me the balance the negroes would owe, and for the peas I had planted, which benefited me none at all, in 1905, but I had planted them with the expectation of realizing a benefit by bringing up the land for the following year. * * * Q. What did she agree to do, if anything? A. She finally agreed to pay for the peas and the planting, and agreed to the number of bushels, though I planted a great many more, and to pay the accounts, and for anything else that I might leave there, later on."

He subsequently testifies that the agreement was, not that defendant should pay the accounts, but that she should buy them, provided they did not exceed $5,000, and he says, quite positively, that nothing else was discussed, at that time, save the questions of the termination of the lease, the accounts due by the tenants, and his claim with regard to the peas; defendant's obligation with respect to anything else having been assumed (according to such subsequent testimony) at a later period and after she had acquired possession of the property. Plaintiff admits that Holmes was, at first, wholly unwilling that defendant should pay anything in order to be restored to possession. He also admits that, upon the occasion of the alleged agreement in New York, he did not have the accounts of the tenants with him, and did not know how much they then owed, and, still less, how much they would owe at the end of the year. It does not appear that he ever made any assignment to defendant of his claims against the tenants; that the tenants were ever formally notified of the alleged change of creditors; or that their accounts on plaintiff's books were ever closed; nor does it appear that either defendant or plaintiff ever made any attempt to collect the accounts.

Holmes' version of the matter is that there were frequent discussions (in New York) between him and plaintiff, and two or three in which defendant participated; that plaintiff urged that he had put out a good deal of money with the expectation of renewing his lease and was entitled to reimbursement; that defendant was anxious to get her property back, without litigation or delay, and was willing to pay a few thousand dollars in order to do so; but that plaintiff was claiming very much more than the witness (to whom defendant left the settlement of the matter) was willing to advise his client to pay, particularly as he knew nothing about plaintiff's disbursements save what plaintiff then told him. He says, in his testimony:

"As I remember it, * * * I would not agree to let Mrs. Murdoch agree to pay any such amount. I think it was something like $10,000 he would come out behind on the two places. * * * I said that, when we made a good crop, and got ahead, and Mrs. Murdoch wanted me to, I would agree to pay a reasonable amount, if he would turn the property over without any litigation and would not bother the negroes, cattle and hogs, and stock, and would not try to move any of the tenants. Q. I will ask you, Mr. Holmes, to state whether or not there was ever any definite agreement about what you would pay, later, on these accounts, if you made a good crop? A. No. * * * Q. State whether or not there was ever any attempt (agreement) on the part of Mrs. Murdoch to collect these accounts, and by whom it was entered into? A. I think that would be optional with her whether she wanted to do that. Mrs. Murdoch and I both felt very kindly towards Mr. Yerger and the Maxwell-Yerger Company, on account of favors shown to us, not only in getting tenants, but in any way he, or they, could, and we both felt very kindly to Mr. Yerger, and Mrs. Murdoch wanted him paid what he was out, in a reasonable amount."

He testifies that he considered that Mrs. Murdoch was under some moral obligation in the matter, but, whilst plaintiff insisted upon a larger amount, he (witness) always thought that $2,000 would be what he would be willing to "stand for," to be paid, when collected, upon the making of a large crop; that no definite agreement on the subject was ever reached; that he had no recollection of having agreed to pay for any peas; that such an arrangement would not be customary; that he had never heard of its hav-

ing been made by others; that, as to the farming implements, he told Oaks, the manager, that they would buy everything left by Yerger that they could use, but no price was agreed on; that (some months after the conversation in New York) he ascertained from Mr. Jones (who represented defendant's then guardian, the trust company) that he (Jones) had sold plaintiff certain cattle and hogs, which he (witness) then agreed with plaintiff to buy back, though there appears to have been no identification of the animals and no price fixed. He admits having obtained $150 from plaintiff, for defendant's account, in New York, and also admits that he paid plaintiff the $100 with which the account sued on is credited, knowing that defendant owed him the $150 and also owed him something for the cattle, hogs, and implements.

The witness testifies that he does not remember that any such account as that sued on was ever presented to him, or that he ever saw the tenants' accounts, save at the "store," where he "happened to look at the books to see what the various tenants owed him" (plaintiff). There is in evidence a letter from the witness to plaintiff reading as follows:

"July 29, 1906.

"Dear George: I have not collected the money due Mrs. M—— from the party in Jackson, I do not see how I can settle the account until she gins. If I can borrow some money in the meantime, I will remit, but the money is not here to make good.

"Sincerely,     [Signed] Wm. S. Holmes."

The writer testifies that he has no recollection of the letter and does not know to what account it refers, but that there was no one in Jackson from whom he could have expected to collect an amount sufficient to pay the account here sued on. Plaintiff testifies, with uncertainty, that, as he takes it, the letter refers to the account sued on. He does not, however, produce any copies of his own letters or of the letters of Maxwell-Yerger Company, of which concern he was an active member, and, as the evidence shows that Mrs. Murdoch, at that time, owed an account, or accounts, to the firm, in settlement of which her agent gave a note, our conclusion is that the letter referred to that business. Mr. Holmes' relations with the defendant terminated in July, 1907, and he was succeeded in his position, as her agent, by E. C. Montgomery, who testifies that, although plaintiff spoke to him about Mrs. Murdoch's indebtedness, and though he represented that lady until March 20, 1908, he never heard of the account sued on until after this suit was filed (which was in November, 1908), and that, as Mrs. Murdoch had an unpaid account in one of the Maxwell-Yerger stores, he naturally assumed that plaintiff was referring to it; which testimony is in apparent conflict with that given by plaintiff, who says that he mailed to Judge Montgomery a copy of the account sued on. Towards the close of plaintiff's examination, we find the following:

"Q. On the 21st of February, 1906, there was an item, 'cash paid Maxwell-Yerger Company, store account, $500,' on the account book of Holmes against Mrs. Murdoch, and there is another item, on the 27th day of February, 1906, in the same account of $500, 'store account.' Can you tell whether any of the items going to make up these accounts were articles charged on the account sued on?"

To which the witness replied:

"I know, positively, not."

Counsel then said to him:

"Q. I will ask if you will look up the two accounts and file copies with these papers?"

To which he replied:

"Yes, I will have Maxwell-Yerger Company make a copy of those two accounts."

Immediately following the answer thus given, we find, on the face of the transcript, an interlineation, apparently made after the transcript was completed, reading:

"Witness Yerger produced the two documents, and they were filed June 12, 1909. [Signed] W. H. Harvey, Clk."

At the date last mentioned, the case having been submitted, the record had been in the hands of the trial judge for a month or six weeks, and we infer that he never heard of the filing of the document (there being, in fact, but one), since he does not mention any such thing in his opinion.

"The two documents," as thus mentioned by the clerk, were not included in the transcript, and, some months after the appeal had been lodged in this court, plaintiff, through his counsel, applied for a writ of certiorari, alleging:

"That the transcript of appeal herein filed is incomplete, in this: That on the last day of the trial in the court a qua, the plaintiff, being on the stand as a witness, was called on by the defendant to produce a certain document, being an account of the items sued on in this cause, which he had testified was presented by him to W. S. Holmes, agent of the defendant, and which was approved by said agent by a written indorsement thereon, signed by said agent, and thereupon the plaintiff, yielding to said call, agreed to produce and file the said document, if it could be found. Petitioner shows that, subsequently, on the 12th day of June, 1909, he complied with the said call by producing and filing, in the office of the clerk of the court a qua, the said document, which was received by the said clerk and by him indorsed: 'Filed in evidence, June 12, 1909.' But petitioner alleges that, in making up the transcript of appeal herein, the said clerk omitted the said document therefrom."

And the prayer is that the clerk be ordered to send up a certified copy of the document thus described, which the clerk appears to have done; the document returned by him purporting to be a copy of an account against the defendant, and in favor of plaintiff, in which defendant is charged with "300 bu. of peas and planting, $1,050," as in the account "B" annexed to the petition, and is further charged with the amounts due plaintiff by the tenants, the names of the latter, with the amounts due by each, being set forth in detail, the whole showing an indebtedness by defendant of $5,718.01, of which $4,668.01 appears to be due for ten-

ants' accounts. Upon the face of this instrument, there appears the following:

"O. K. [Signed]   Wm. S. Holmes."

Defendant, examined as a witness, says:

"I only recall having a social conversation with Mr. Yerger. It was down in a public hall, and it was no place to discuss business."

She positively denies having had any conversation with plaintiff concerning the termination of his lease, the tenants' accounts, the peas, or any other business matters, and denies having received from him the items of $150 and $30, in cash, for which she is charged, though she says that those amounts may have been given to Mr. Holmes. She also says that plaintiff gave her the hogs that he was leaving on the place, and that she returned thanks. The judge a quo rejected plaintiff's claim, as predicated upon the alleged purchase by defendant of the tenants' accounts and the alleged agreement to pay for the peas, and gave judgment in his favor for a balance of $1,077.45, with interest. Defendant has appealed, and plaintiff has answered, praying for an amendment of the judgment.

## Opinion.

A motion has been filed in this court suggesting the death of the defendant and making R. N. Farrar, her executor, a party to the appeal. Another motion has been filed, alleging that the document brought up by certiorari is no part of the record; "that it is an ex parte and unsworn statement, filed without the consent of, or notice to, defendant, more than a month after the case had been tried and submitted, and while the case was under advisement; and that the clerk had no authority to receive and file same, as part of the evidence in this case or otherwise"; further alleging that the averments contained in the petition for certiorari, to the effect that said document was called

for and its filing authorized, are incorrect; and praying that said document be stricken from the record and not considered.

We are of opinion that this motion (last above mentioned) should be sustained. What plaintiff was authorized to file, after the submission of the case, were copies of two supposed accounts, to be taken from the books of Maxwell-Yerger Company; the one, showing a payment to that concern, by defendant, of $500, on February 21, 1906, and the other showing payment of a like sum by defendant on February 27, 1906, and the purpose being to ascertain whether in those accounts, or either of them, defendant is charged with any of the items which go to make up the account sued on. And that plaintiff was aware that the call was for the two accounts of Maxwell-Yerger Company against defendant, and not for a copy of his account as sued on, appears evident from his answer to the request of defendant's counsel:

"I will ask if you will look at the two accounts and file (copies) with these papers."

The answer being:

"Yes, I will have Maxwell-Yerger Company make a copy of those two accounts."

Considering the case upon the basis of the evidence properly in the record, we find it somewhat remarkable that plaintiff should have paid his rent note due November 1, 1905, without making some effort to collect the $6,695.46 which he here claims. Passing on, however, to the consideration of the different items of his claim, and without going into the question of the authority of defendant's agent to bind her with respect to the tenants' accounts and the peas, we agree with our learned brother of the district court that, as to those items, plaintiff has failed to prove the contract relied on. Agreements between outgoing and incoming lessees of plantations, with respect to the debts due by the tenants, are, no doubt, common enough, though they are not matters of course, and

plaintiff admits that, when he took the plantations in question, he assumed no obligation with respect to the debts due by the tenants to his predecessor. When first testifying, he stated that he visited New York in August, 1905, and that defendant and her agent then agreed to pay him the amounts due by the tenants, and also to pay him $1,050 for peas which he had planted, including the cost of planting them. Somewhat later, and after an objection had been sustained to oral testimony of a promise to pay the debt of a third person, he corrected his former statement and said that his visit to New York was made, say, in the latter part of September, or about the first of October, and that defendant and her agent agreed to pay him for the tenants' accounts; that is to say, to buy them from him, provided they should not exceed, in the aggregate, $5,000. He admits, however, that he did not have the accounts with him, and that he did not know the amount due by any one tenant, or by them all, and we infer that he would not have known the tenants, or many of them, if he had met them. Under such circumstances, it seems to us highly improbable that defendant and her agent, who were even more in the dark, would have agreed, as plaintiff testifies that they did, to pay him "for each and every one of the accounts, provided it (the aggregate account) was not over $5,000"; the more particularly as, at that time (whether early in August or about October 1st), it is not likely that the crops had been marketed, or that there had been even such partial settlement as would have enabled plaintiff, though he had been at home, to determine how he and his tenants would stand at the end of the year. To this improbability we must add the direct testimony of the parties with whom plaintiff says he contracted, to the effect that no such contract as that testified to by him was made, and we must add the facts that it is not shown that the ac-

counts alleged in the petition to have been "sold, assigned, and delivered" were ever identified or assigned, that the tenants were ever notified that they could discharge their debts to plaintiff by payments to defendant, that defendant ever collected, or attempted to collect, any of the accounts, or that plaintiff, in his settlements with the tenants, after his negotiation with defendant, or her agent, in New York, did not collect some, or parts of some, of the accounts referred to in those negotiations.

The claim for the price of, and for the cost of planting, the peas, has no better support. Plaintiff says that defendant and her agent agreed to pay him $1,050 for 300 bushels of peas which he had planted solely to fertilize the land. Defendant denies that she made any such agreement, and her agent says that he has no recollection of having done so, and that it would have been an unheard of thing; the fact being that cotton lands require fertilization year after year, and that a particular lessee, getting the benefit of the fertilization done by his predecessor, concedes to his successor the benefit of that which he does. William Oaks, plaintiff's manager, testifying, as a witness on his behalf, says that defendant's husband, Murdock, always planted peas, that they were planted on Fortune Fork and Banner plantations in 1904, and that those places were in about the same condition when plaintiff surrendered them as when he received them, which was no more than was required by plaintiff's contract.

The petition alleges that plaintiff "sold and delivered to said Mrs. A. A. Murdoch, through her agent and general manager, W. S. Holmes, certain farming implements, live stock, peas, oats, cotton seed, and handed her, in cash, items amounting to $2,127.45," etc., and the account which is made part of the petition itemizes the articles said to have been sold and distinguishes them from the money said to have been handed to the de-

fendant. The objection that there "is no allegation in the petition covering borrowed money" is, therefore, not well taken, and we think that the proof sustains the claim for the two items of $150 and $30, said to have been handed to the defendant; those amounts having been handed to her agent for her account. With regard to the items, aggregating, on the face of the account, $326, for shovels, plows, cotton planters, and cultivators, we notice that 10 double shovels, at $3, should result in a charge of $30, and not $36, as stated in the account; but the evidence fails to show either that the articles charged for were delivered, or that there was any price agreed on. Oaks, plaintiff's manager, testifies that plaintiff bought a good many implements, such as those mentioned in the account, and that he took none away; but he is unable to say how many were bought or how many survived the wear and tear of a year's use, no inventory having been taken when the plantations were surrendered. The same is true with regard to the cattle and hogs. Plaintiff bought certain live stock from defendant's guardian, and defendant, through her agent, agreed to repurchase it, at the price paid; but plaintiff does not know how many hogs, pigs, cows, or heifers were on the places when he gave them up, and no one else appears to be much better informed. Oaks testifies, in effect, that defendant received three hogs and "some pigs," and four or six head of cattle, including both cows and calves; but whether there were four or six, and how many were cows and how many calves, we are not informed. As to live stock, therefore, the case is made out with respect only to three hogs and a plurality of, or, say, two, pigs. Plaintiff's testimony in regard to the items of $178.20 for oats, and $148.75 for "4½ tons of tools and Peterkin Co. seed," is not as definite as it should be; but, as there appears to be nothing to the contrary, it may be accepted as·

sufficient. It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the principal amount awarded from $1,077.45 to $519.95, and by rejecting the demand for the value of agricultural implements and cows as in case of nonsuit; plaintiff to pay the cost of appeal.

### On Application for Rehearing.

In writing up the decree, the organ of the court omitted to allow defendant credit for $100 which plaintiff admits that he received.

It is therefore ordered that the decree heretofore handed down be amended, by reducing the amount awarded plaintiff by $100.

Rehearing refused to both applicants.